**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUELINE STINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 C 1614 |
| v. | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| COUNTY OF COOK and MARK ROSENTHAL, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Jacqueline Stinson has been employed by Cook County Animal and Rabies Control ("CCARC") since 2013. In this lawsuit, she alleges that her supervisor, Defendant Mark Rosenthal, and CCARC Administrators retaliated against her in 2017 and 2018 after she complained of discrimination on the bases of race, color, and sex. In August 2017, Plaintiff complained to former CCARC Administrator Dr. Donna Alexander and other Cook County employees that Alexander had discriminated against Plaintiff because of her race, Black, after Alexander expressed disapproval of the way Plaintiff had decorated her work cubicle for Black History Month. Since that complaint in August 2017, Plaintiff has been suspended several times without pay and her job duties have changed. She alleges these suspensions and job alterations were in retaliation for her complaint of discrimination. On October 5, 2017, Ms. Stinson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the bases of race, color, sex, and retaliation. The EEOC subsequently issued a right to sue letter, and this lawsuit followed. Now represented by counsel, Plaintiff has sued her employer, Cook County, and her supervisor, Mark Rosenthal, alleging retaliation in violation of Title VII of the Civil Rights Act of 1964, and 42 U.S.C. §§ 1981 and 1983. Both Defendants have moved for summary judgment [74, 78] and, as explained below, both motions are granted.

**BACKGROUND**[1]

Plaintiff Jacqueline Stinson, an African American woman, began working for CCARC on February 25, 2013. (Def. Rosenthal Local R. 56.1 Statement of Facts ("Rosenthal SOF") [79] ¶ 1.) CCARC, a program of Cook County, was established "to prevent the transmission of rabies from animal to man." (Def. Cook County Local R. 56.1 Statement of Facts ("Cook County SOF") [76] ¶ 8.) It furthers this mission by, in part, "ensur[ing] the compliance of quarantine protocol for all animal bite incidents," and "maintain[ing] a rabies vaccination database." (*Id.* ¶¶ 8–9.) Plaintiff worked as a Clerk V for CCARC from February 2013 to December 2018; her job duties included answering phone calls, faxing documents, making copies, processing and distributing mail, and working at CCARC's public rabies and microchip clinics. (*Id.* ¶ 4; Rosenthal SOF ¶¶ 8–9.) In December 2018, her job title changed to that of Administrative Assistant I, but her job duties did not change significantly. (Stinson Dep. 28:13–14, Ex. B to Cook County SOF [76-3].) Plaintiff's direct supervisor is Defendant Mark Rosenthal, Deputy Director of the CCARC. (Rosenthal SOF ¶ 10.) Dr. Donna Alexander was CCARC's Administrator until her death in late May 2018. (Stinson Dep. 41:17–42:4.) Dr. Thomas J. Wake became Administrator on July 2, 2018. (Rosenthal SOF ¶ 12.)

Plaintiff is represented by the Service Employees International Union's ("SEIU") Local 73 ("Union") for purposes of disciplinary grievances and other employment matters, and the relationship between Cook County and the Union is governed by a Collective Bargaining Agreement ("CBA"). (*Id.* ¶ 14; Pl.'s Local R. 56.1 Statement of Additional Facts ("Pl.'s SOF") [86] ¶ 15.) Cook County employees are expected to comply with Cook County's Personnel Rules and

---

[1] Both Defendants move to strike facts from Plaintiff's Local Rule 56.1 Statement of Additional Facts as immaterial or argumentative. *See* N.D. ILL. L.R. 56.1(b)(3)(C). In ruling on Defendants' motions for summary judgment, the court will consider only material facts that are properly supported by admissible evidence in the record. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008).

are subject to discipline if they violate those rules.[2] (Rosenthal SOF ¶ 16.) The Personnel Rules and the CBA establish a disciplinary process for Cook County employees. (*Id.* ¶ 17.) If an employee violates the Personnel Rules, she receives a pre-disciplinary notice informing her of the alleged infraction and the possible discipline that may result from such infraction. (*Id.*) The notice also establishes a date for a pre-disciplinary hearing. (*Id.*) A hearing is held before an employee is disciplined, and employees may bring a union representative to the pre-disciplinary hearing. (Cook County SOF ¶ 10.) Pursuant to the CBA, employees may only be disciplined "for just cause," and the employer may consider "the nature and gravity of the misconduct, the employee's disciplinary record and any mitigating circumstances," when determining appropriate discipline. (Rosenthal SOF ¶ 18.) Disciplinary actions may include oral reprimand, written reprimand, suspension, and discharge. (*Id.*) Plaintiff's supervisor Rosenthal denies having final authority to discipline employees; he testified that he recommends discipline to the Administrator, who ultimately approves or denies the recommendation.[3] (*Id.* ¶ 11.)

An employee who disagrees with a disciplinary decision may file a grievance through the Union. The employee first submits the grievance to her immediate supervisor, who may then submit a "step two" grievance to the department head. (*Id.* ¶ 19; Cook County SOF ¶ 16.) Then, the department head may submit a "step three" grievance to a Department of Human Resources designee. (Rosenthal SOF ¶ 19; Cook County SOF ¶ 16.) At the third step, a Hearing Officer

---

[2]     Plaintiff denies this fact by pointing to an instance in which an employee allegedly violated the Personnel Rules and was not disciplined, but the court notes that being subject to discipline does not mean that every policy violation will necessarily result in disciplinary action. (Pl.'s Resp. to Rosenthal SOF [85] ¶ 16; Pl.'s Resp. to Cook County SOF [84] ¶ 10.)

[3]     Plaintiff disputes Rosenthal's assertion that he did not have authority to discipline employees, but the testimony she cites is not inconsistent with that assertion. (Pl.'s Resp. to Rosenthal SOF ¶ 11 (citing Rosenthal Dep. 60:11–61:15, Ex. 3 to Rosenthal SOF [79-3]).) Rosenthal testified that it was his "decision in conjunction with discussions with Labor Relations and the Department of Administration" to suspend Plaintiff for "four or five days" after she stayed at work late without permission in June 2018. (Rosenthal Dep. 60:11–61:15.) This incident occurred in the time between Dr. Alexander's death and Dr. Wake's appointment, when the Administrator position was vacant. (*Id.* 61:1–3.) Rosenthal testified that this was the only instance in which he did not obtain the Administrator's approval prior to issuing discipline. (*Id.* 99:7–13.)

holds a hearing, at which the parties may submit documents as evidence and the employee, her representative, management, and other witnesses may testify. (Rosenthal SOF ¶ 19.) The Hearing Officer then issues a written decision on whether the discipline was issued for "just cause" and whether the discipline was "appropriately progressive." (*Id.*) Finally, the Union may choose to take the grievance to arbitration. (*Id.*)

## I. Alleged Race and Sex Discrimination

Plaintiff claims to have experienced several instances of race and sex discrimination during her employment with CCARC. In December 2016, Plaintiff was waiting to use the microwave in the break room and talking to another Administrative Assistant who is also Black, Spring Kelley,[4] when Rosenthal "squoze past [her]. His body was pressed up against [her] body, front to front . . . [and he] stepped on [her] foot and kept walking." (Stinson Dep. 47:18–48:13; Cook County SOF ¶ 55.) When Plaintiff told Rosenthal that he had stepped on her foot, "he just laughed." (Stinson Dep. 47:18–48:13.) Plaintiff also described this incident in a December 2016 letter to Cook County's Equal Employment Opportunity ("EEO") Office. Plaintiff explained that the hallway is narrow, but Rosenthal nevertheless attempted to pass Stinson, which she characterized as "impossible" to do. (Dec. 8, 2016 Letter from Stinson to Dominic ("Dominic Letter") at PageID #:1239, Ex. 56 to Rosenthal SOF [79-2].) She stated in her letter that instead of saying "excuse me," Rosenthal "squeezed" past Stinson, and in the process, "[h]is body was rubbing up against [Stinson's]," and he stepped on her foot. (*Id.*) Rosenthal then greeted Kelley while ignoring Stinson, even after she said, "excuse you Mark you stepped on my foot." (*Id.*) In her own deposition, Kelley denied Plaintiff's version of the events, stating "I was there and I saw the whole incident. . . . I saw when he passed by her and there was no contact. . . . I told her I didn't want anything to do with it because she wanted me to say something that didn't happen, and I refused to do that." (Kelley Dep. 11:14–12:14, Ex. 7 to Rosenthal SOF [79-7].)

---

[4] The parties refer to Ms. Kelley both by that name and as Spring Whigham, the name she took when she married. (Kelley Dep. 6:16–24.)

In the same December 2016 letter, Stinson described other incidents involving Rosenthal. On December 5, 2016, Plaintiff was making copies at the office Xerox machine when Rosenthal came "very close to bumping into [her]" while he was "walking fast, and strong" past her. (Dominic Letter at PageID #:1240.) Atria Peterson, an Administrative Assistant who is Black, was also at the Xerox machine at the time, and agreed that Rosenthal had come close to bumping Stinson. (*Id.*; *see also* Rosenthal Dep. 57:17–18; Apr. 21, 2017 EEO Report at PageID #:1193, Ex. 12 to Rosenthal SOF [79-2].) Rosenthal also allegedly directed Peterson not to talk to Stinson on October 5, 2016, and at some other time, told Kelley and Jessie Young, a Supervisor for the Animal Control Officers who is Black (Pl.'s SOF ¶ 4), not to talk to Stinson. (Dominic Letter at PageID #:1240.)

In February 2017, Plaintiff alleges that Alexander, who was also a Black woman (Stinson Dep. 27:15–20), took issue with the way Plaintiff had decorated her cubicle in celebration of Black History Month. (*Id.* 68:22–70:14.) Plaintiff recalled that in February 2017, Alexander came into Plaintiff's cubicle and loudly "antagonized" Plaintiff about her cubicle decorations. (*Id.* 60:5–9.) Specifically, Plaintiff testified, Alexander "told [Plaintiff] that [she] needed to get with her and do things that was applicable to the office." (Cook County SOF ¶ 19.) Alexander also said, "next year I need to get with you, and do some research because [Plaintiff] was missing some people on [her] cubicle." (*Id.*) One of Alexander's specific complaints about Plaintiff's decoration was that it did not feature a picture of the first Black veterinarian. (*Id.*) Then, Plaintiff testified that on March 1, 2017, Alexander, whose demeanor was "loud" and "belligerent," told Plaintiff she should take down her Black History Month decorations, and that Alexander would tell her which decorations to put up the next year. (Stinson Dep. 61:7–11, 68:22–70:14.) Plaintiff explained that "[e]very other employee has decorated their cubicle for other holidays" such as St. Patrick's Day, Cinco de Mayo, and Christmas, without issue. (*Id.* 84:6–15.) For example, Donna Ciesielski, a white Administrative Assistant, had decorated her cubicle for Valentine's Day, St. Patrick's Day,

and Thanksgiving. (*Id.* 89:20–90:10.) And Tina Fortune, an Administrative Assistant who is Hispanic, decorated her office for Christmas. (*Id.* 91:1–13; Cook County SOF ¶ 52.)

Finally, on August 24, 2017, a client named Eric Shaffer came into CCARC needing assistance because his dog had bitten or scratched someone. (Stinson Dep. 57:14–59:11.) At the time Shaffer arrived, all of the employees who handle dog bite situations were downstairs for an administration hearing. (*Id.*) When Plaintiff took Shaffer downstairs, they encountered Rosenthal and two other employees. (*Id.*) According to Plaintiff, Rosenthal entered the room where the hearing was being held and whispered into Alexander's ear. (*Id.*) Alexander then approached Plaintiff and, according to Plaintiff, asked, "Jackie, can I help you with something? Why are you down here?" (*Id.*) Plaintiff recalls that Alexander "stepped and got into [Plaintiff's] face and stated that, and before [Plaintiff] can respond, the patron stated that she—he stated on my behalf that I was down there because I was helping him." (*Id.*) Mr. Shaffer later wrote a letter to CCARC expressing his opinion that Alexander's behavior in asking Stinson "if she was done yet," in front of and while helping a customer, was "unprofessional, rude and disrespectful toward [him] as a customer." (Sept. 1, 2017 Letter from Schaffer to Cook County, Ex. 13 to Stinson Dep.) Plaintiff believes that Alexander treated "dark African Americans and dark people in general harsher than they treated others." (Pl.'s SOF ¶¶ 5, 13.)

## II.     Plaintiff's Complaints of Discrimination

Plaintiff claims that she first reported Rosenthal for discrimination and harassment to Martha Martinez, the Chief Administrative Officer of the Cook County Bureau of Administration, in December 2015. (Rosenthal SOF ¶ 13; Stinson Dep. 132:17–133:24.) There are no detailed records of what Stinson and Martinez discussed at this meeting, but Plaintiff testified that the meeting concerned Rosenthal's alleged discrimination against her based on her race. (Stinson Dep. 201:10–202:4.) Rosenthal denies knowing about any of Plaintiff's complaints of discrimination until January 2017 (Rosenthal SOF ¶ 62), and Plaintiff does not dispute this (Pl.'s Resp. to Rosenthal SOF ¶ 62). Plaintiff also acknowledged that she did not inform her supervisors

that she would be meeting with Martinez. (*Id.* 133:11–13.) Plaintiff nevertheless believes that Rosenthal was aware of what Stinson had discussed with Martinez because (at some point not identified in her testimony) Rosenthal "told [Stinson] he was going to contact [Martinez]." (Stinson Dep. 201:24–202:1.)

On December 8, 2016, Stinson sent a letter to Letitia Dominic of Cook County's EEO Office in which Stinson accused Rosenthal of being "racist, sexist, [and] biased," and of subjecting her to harassment for more than a year. (Dominic Letter at PageID #:1239.) Stinson requested Dominic's assistance with the "hostile and highly dysfunctional environment" in which Stinson claims to have been working. (*Id.*) Stinson reported that she had recently filed a grievance (which does not appear to be in the record before this court). (*Id.*) The letter does not detail in full the harassment that Stinson claims had occurred during the preceding year, but Stinson did summarize several incidents that she suggested were illustrative of Rosenthal's conduct. (*Id.*) Stinson first described the incidents on December 5 and 7, 2016 when Rosenthal almost bumped into Plaintiff and allegedly stepped on her foot in attempting to move past Stinson in a hallway. (*Id.*) Stinson wrote that she had reported these events to Alexander, along with information "about some issues with another subordinate in the office," but had received no response. (*Id.* at PageID #:1240.) Stinson stated that she was "tired of being subjected to this type of harassment and abuse," and noted that the "problem is escalating, because now it has gotten physical." (*Id.*) She also believed that Rosenthal deliberately bumped into her to "demoralize and degrade" her. (*Id.*)

On January 20, 2017 Plaintiff filed a formal complaint of harassment and discrimination with Cook County's EEO Office. (*See* Apr. 21, 2017 EEO Report at PageID #:1192.) Plaintiff's EEO complaint included the same allegations as her letter to Dominic, and a report prepared by a Cook County Bureau of Human Resources EEO officer noted that Plaintiff believed Rosenthal mistreated her "because he is racist and sexist, and because he is retaliating against her for having filed a union grievance." (*Id.* at PageID #:1193.) The report noted further, however, that Stinson "did not provide specific facts about the conduct as it relates to her race or sex." (*Id.*)

The Bureau of Human Resources did "not sustain [Stinson's] allegations of workplace violence or harassment on the basis of sex or race"; the Bureau's report explained that its workplace violence policy does not prohibit "accidental" or "incidental contact" such as Rosenthal's having "nearly bumped" into Stinson or "brushed past her, stepping on her foot." (*Id.* at PageID #:1192, 1194–95.) The report explained, further, that Cook County's workplace policies prohibit workplace harassment when the conduct is "sufficiently severe, persistent, or pervasive to create a hostile work environment," but found that Stinson's claim that Rosenthal "harassed her by instructing other employees not to speak with her, and that he did so because of her race, African-American, and her sex, female," was "not plausible." (*Id.* at PageID #:1195.) Two of the coworkers were female and all three were African American; additionally, Rosenthal's conduct did "not evince any particular animus towards members of her sex or her race," and Stinson had not alleged that "similarly-situated employees outside of her protected category were treated better." (*Id.*)

On March 3, 2017, Plaintiff responded to Alexander's instructions about her cubicle decorations in a letter. (Mar. 3, 2017 Letter from Stinson to Alexander at PageID #:669, Ex. 11 to Stinson Dep. [76-3]; *see also* Cook County SOF ¶ 20.) Plaintiff wrote that she had "put pictures up around [her] cubicle of African Americans that we pay homage to for the work that they did," and noted that if "it was not for the many individuals that are on [her] wall of fame laboring for justice and equality, people like you and I would not be where we are today." (Mar. 3, 2017 Letter from Stinson to Alexander at PageID #:669.) Plaintiff asserted that after the February 2017 conversation with Plaintiff, during which Alexander allegedly told Plaintiff whose photographs to post the following year, Plaintiff had been the "talk/gossip of the office." (*Id.*) Plaintiff felt that the conversation had created "a hostile work environment." (*Id.*) She also asked why Alexander had instructed her to post photographs of people "applicable to [the] office," for Black History Month the following year. (*Id.*) She observed that other employees were permitted to decorate their cubicles without comment, and continued that she was "not really sure why and how this disparate treatment exists, but it does exist in this department!" (*Id.* at PageID #:670.) The letter also asked

for clarification about what had prompted Alexander to ask Stinson to remove the decorations. (*Id.* at PageID #:670–71.)  In closing, Plaintiff noted that "Cook County is a very diverse organization, and throughout the entire County offices people celebrate many Holidays."  (*Id.* at PageID #:671.)

Alexander responded in a March 8 e-mail message, explaining that holiday decorations are permitted on the exterior of work spaces but must be removed after the holiday.  (Mar. 8, 2017 Email from Alexander to Stinson, Ex. 14 to Stinson Dep.)  Alexander also "offered [to share her] expertise in developing next year's Black History Month[ ] display due to [Alexander's] experience teaching STEM (Science, Technology, Engineering and Math)"; Alexander added that she had "presentations on the contributions of African American scientists and could make them available to [Stinson]."  (*Id.*)  Alexander circulated a separate memorandum on March 23, 2017 explaining the office decoration policy, including the direction that "[a]pproved seasonal decorations are to be removed within two days after the seasonal event has ended."  (Stinson Dep. 91:14–24, 92:1–3.)

Months later, in a meeting with Alexander on August 24, 2017, Plaintiff complained that Alexander had consistently retaliated and discriminated against Plaintiff.  (Pl.'s SOF ¶ 24; Cook County SOF ¶ 24.)  On that same day, Plaintiff also told Martinez that she had been discriminated against, citing the cubicle incident with Alexander and other unspecified retaliation and discrimination that had occurred since January 2017.  (Cook County SOF ¶ 24; Rosenthal SOF ¶ 63.)  On August 25, 2017, Plaintiff sent an e-mail to Alexander, Martinez, John Shostack (Plaintiff's union representative), and Betty Torres (Special Assistant to the Chief Administrative Officer) in which she complained that Alexander had reprimanded her in front of a group of people

while Plaintiff was helping Mr. Shaffer, and requested a meeting to discuss actions that could be taken to "stop the harassment and bullying."[5]  (Rosenthal SOF ¶ 64; Cook County SOF ¶ 25.)

### III.  Disciplinary Actions Taken Against Plaintiff

Plaintiff Stinson has been disciplined several times since her first alleged complaint of discrimination in December 2015.

#### A.  January 2016 Oral Reprimand for Leaving Workplace

Plaintiff testified that she had received permission from Martinez in December 2015 to discuss in person Plaintiff's complaints about Rosenthal.  (Stinson Dep. 133:6–133:21.)  When Stinson left the office to go to this meeting, she did not tell Rosenthal or another supervisor, but instead filled out a "break/in field sheet," which Plaintiff explains is a form that an employee fills out if they are leaving work and "going somewhere that is work related."  (*Id.* 222:16–21.)  On January 6, 2016, Rosenthal issued a pre-disciplinary notice charging Plaintiff with violating the Personnel Rules by leaving her assigned workplace on December 17, 2015 without a supervisor's permission.  (Rosenthal SOF ¶ 20.)  As a result, and after a hearing, Plaintiff received an oral reprimand.  (*Id.* ¶¶ 20–21.)  Plaintiff grieved this reprimand, but the Hearing Officer, Vilma Colom, denied the grievance at the third step after finding that management had just cause to issue the oral reprimand.  (*Id.* ¶ 22; Cook County SOF ¶ 28.)

#### B.  September 2017 Written Warning for Improper Mail Processing

On September 5, 2017, Alexander issued Plaintiff a written reprimand for violating the Personnel Rules by "failing to complete assignments and discarding important documents necessary for the operation of the department."  (Rosenthal SOF ¶ 24; Cook County SOF ¶ 29.)  The discarded documents were "business reply statements" that an Administrative Assistant, Donna Ciesielski, needed to pay the department's bills.  (Rosenthal Dep. 34:13–22.)  Plaintiff

---

[5]      The parties agree that Plaintiff sent an e-mail on August 25, 2017 to Alexander, Martinez, and Shostack, but the court notes that the e-mail in the record appears to have been sent to Alexander, Martinez, and Torres.  (*See* Ex. 18 to Stinson Dep. at PageID #:696.)

shared responsibility for processing mail at this time (Stinson Dep. 27:4–5), but testified that she did not receive training or instruction related to business reply statements (*id.* 103:1–4, 135:7–11). Rosenthal acknowledged that he had never personally told Stinson that she was processing mail incorrectly prior to issuing the pre-disciplinary notice. (Rosenthal Dep. 36:1–4.) Plaintiff admits, however, that, prior to being disciplined, she had received e-mails in November 2016 and March 2017 from Ciesielski, informing Plaintiff that business reply statements were important and that Plaintiff should deliver them to Ciesielski as soon as they came in. (*Id.* 104:6–105:6; Cook County SOF ¶ 29.) Plaintiff admits, further, that she did not provide the business reply statements to Ciesielski. (Stinson Dep. 135:20-22.) Plaintiff did not file a grievance in response to this disciplinary action. (Cook County SOF ¶ 30.)

### C. September 2017 Two-Day Suspension for Intimidating Coworkers

Plaintiff was suspended without pay for two days in September 2017 after Christine Do, a Clerk, formally complained that Plaintiff had "followed Clerk Christine Do into the 3rd floor washroom and banged on the stall door wall. When [Christine Do] exited the stall [Plaintiff] taunted her." Plaintiff also allegedly "accosted Clerk Tina Fortune in the parking lot area and shouted obscenities at her." (Rosenthal SOF ¶ 25.) Alexander directed Rosenthal to serve Stinson with a pre-disciplinary notice on September 5, 2017, and Alexander determined after a hearing that Plaintiff's conduct violated the Personnel Rules. (*Id.* ¶¶ 25–26.) Plaintiff grieved this disciplinary decision, but Hearing Officer Colom denied the grievance. (*Id.* ¶ 27.)

Plaintiff denies that either incident happened in the way represented in the disciplinary action. (Stinson Dep. 136:6–138:7.) Indeed, Plaintiff claims, two coworkers, Kelley and Peterson, made "written statements indicating that [Plaintiff] did not accost Tina Fortune," but "[m]anagement ignored" those statements. (*Id.*) Asked about the parking lot incident in her deposition, Kelley testified that Plaintiff had been loud, vulgar, and angry about Rosenthal, but had not accosted Fortune. (Kelley Dep. 50:8–52:5.) Another coworker, Jessie Young, signed a statement prepared by Stinson stating that Stinson did not taunt Christine Do in the bathroom.

(Pl.'s SOF ¶ 6.)  Young testified that he had been 20 feet from the door of the women's restroom, talking with Kelley, at the time of the alleged incident between Stinson and Do, but did not "hear any noise of taunting in the restroom."  (Young Dep. 32:5–7, 33:11–14, 34:2–16, Ex. B to Pl.'s SOF [86-2].)

### D.    October 2017 Three-Day Suspension for Failure to Accept Paperwork

In October 2017, Alexander suspended Plaintiff for three days after she "failed to heed the direct order, numerous times, of the Deputy Director of [her] department to speak directly to him. [She] failed to heed his direct request for [her] to accept paperwork that was earmarked for [her]. [She] also failed to heed the direct order of the Administrator to take the paperwork being handed to [her] by the Deputy Director."  (Cook County SOF ¶ 36.)  The pre-disciplinary notice also stated that Plaintiff had left a rabies clinic at Harrison Park while still on duty, despite being directed to stay by Rosenthal and Alexander.  (Rosenthal SOF ¶ 28.)  The paperwork at issue was a pre-disciplinary notice, sealed in an envelope, related to the incident between Stinson and Do; Alexander had directed Rosenthal to give Plaintiff the papers at the end of the rabies clinic hours. (*Id.* ¶ 29.)  After Plaintiff was found to have violated the Personnel Rules (*see* Cook County SOF ¶ 35), Plaintiff filed a grievance, but Hearing Officer Colom denied the grievance, concluding that the three-day suspension was supported by just cause.   (Rosenthal SOF ¶ 31.)

Plaintiff refers to this episode, which occurred on September 25, 2017, as "the incident whereas [Rosenthal] assaulted me and battered me out in the field."  (Stinson Dep. 139:6–7.) She claims that she did not commit the infractions for which she was disciplined.  (*Id.* 139:13– 140:6.)  She instead claims that at the end of the clinic hours, "Rosenthal came up behind [her] and asked [her] if he could speak with [her]."  (*Id.* 54:22–55:3.)  Plaintiff told him that she "had somewhere to be" and "could not stay," and asked if they could talk the next day.  (*Id.* 55:1–3.) Rosenthal warned Plaintiff that she was not yet permitted to leave because she was still scheduled to be working.  Plaintiff disagreed with that instruction; she contends that "when we are out in the field [at a clinic], we are not scheduled from 8:30 to 4:30 p.m." and because she had not taken

time for lunch or other breaks, she should have been free to leave. (*Id.* 55:4–10.) Rosenthal then allegedly "followed [her] half—for a half a block to [her] car, and when [she] got in [her] car . . . [h]e slung a very large envelope into [her] car. It hit [her] on the side of [her] face and on [her] shoulder." (*Id.* 55:4–17.) Plaintiff claims that she filed a police report over the phone regarding this incident but did not receive a copy of the police report. (*Id.* 95:22–96:9.) Her testimony about the disposition of the report was somewhat inconsistent. Initially, Plaintiff testified that the police told her that they had "issued a warrant" (presumably for Rosenthal) and "brought it in front of the judge." (*Id.* 96:13–17.) Seconds later, Plaintiff testified that she "never said a warrant was issued." (*Id.* 97:1-6.) She then stated that she followed up in person by going to the police station and requesting that they police issue a warrant for Rosenthal's arrest. (*Id.* 97: 11-18.) The police did not issue a warrant, however, because, she testified, the police explained that the person to whom Plaintiff had made the report over the phone was support staff, not a police officer, and that person did not "write down the accurate information of the events"; because of this, the police told her "there was nothing [she] could do." (*Id.* 97:21–98:7.)

Plaintiff's coworker, Luis Ortiz (an Animal Control Warden), also witnessed the September 25, 2017 incident. He recalled that "Rosenthal tried to serve [Plaintiff] with disciplinary papers and [Plaintiff] refused to take them, and a big argument broke out." (Ortiz Dep. 7:22–23, 19:1–3, Ex. A to Pl's SOF [86-1].) Ortiz testified that it was his opinion that Rosenthal provoked Stinson by trying to serve the pre-disciplinary notice in front of Plaintiff's coworkers. (*Id.* 19:8–16.) When Stinson refused to take the papers, entered her car, and closed the door, Rosenthal followed her to her car, and then tried to open Stinson's car door to give her the papers. (*Id.* 19:17–24.) Ortiz was not asked to confirm whether Rosenthal hit Plaintiff with the envelope.

### E. December 2017 Three-Day Suspension for Intimidating a Coworker

On November 26, 2017, Samantha Williams, a Clerk, complained to Rosenthal and Alexander that Stinson had "approached Ms. Samantha Williams in her cubicle in an aggressive manner using verbal and body language in an intimidating manner." (Rosenthal SOF ¶ 32.)

Plaintiff characterizes the incident as a "professional" conversation during which Plaintiff informed Williams that Plaintiff was no longer responsible for assisting walk-in customers; there was also a misunderstanding about whether Plaintiff had been on her lunch break when a customer entered the office. (Stinson Dep. 141:3–142:2.) Rosenthal, at Alexander's direction, gave Plaintiff a pre-disciplinary notice on November 28. (Rosenthal SOF ¶ 32.) Alexander suspended Plaintiff for three days in December 2017 for this incident (*Id.* ¶ 33; Cook County SOF ¶ 39), which Plaintiff grieved, but her grievance was denied before the hearing stage. (Rosenthal SOF ¶ 33.)

### F. June 2018 Five-Day Suspension for Failure to Provide Driver's License

Rosenthal issued to Plaintiff another pre-disciplinary notice on June 19, 2018. (*Id.* ¶ 34.) In Defendants' version of the events, Plaintiff violated the Personnel Rules by failing to provide a copy of her driver's license prior to driving a county vehicle to a rabies clinic on June 6, 2018, despite being directed to do so on May 4, May 23, and May 31, 2018. (*Id.*; Rosenthal Dep. 54:20–57:7.) The notice stated:

> On May 4, 2018, you received an email directing you to provide a copy of your current driver's license by May 9, 2018 in order to be a driver for the June 6, 2018 clinic. No driver's license received.

> On May 23, 2018, you met with Dr. Alexander to discuss the 2018 clinics and [were] reminded that your driver's license was required.

> On May 31, 2018, a final message was sent directing you to provide the driver's license or that the drivers duties would be reassigned. Employee response received 24 hours later, at which point the duties already reassigned.

(Cook County SOF ¶ 42.) Plaintiff claims that she did not initially provide a copy of her driver's license because Alexander "instructed [her] not to." (Stinson Dep. 145:9–12.) Specifically, during an all-staff meeting on May 2, before the first email requesting Plaintiff's license, Plaintiff testified that Alexander had assured staff that "[i]f you have ever provided a copy of your driver's license, [then] we have it on file," and so only those employees who had not previously furnished a copy of their driver's licenses were required to do so now. (*Id.* 145:15–24.) There is no evidence that Alexander told Plaintiff that she, specifically, did not need to provide a copy of her license during

the May 2 meeting.  Plaintiff denied meeting with Alexander on May 23, but did not deny receiving the May 4 and May 31 emails.  (*Id.* 145:4–146:12.)  Because Alexander died over Memorial Day weekend, and Wake had not yet replaced her, it is unclear who, if anyone, directed Rosenthal to issue this discipline.  Plaintiff attended the pre-disciplinary hearing and was suspended for five days.  (Rosenthal SOF ¶ 35.)  Plaintiff's union filed a grievance on her behalf, but Hearing Officer Goss found just cause for the suspension.  (*Id.* ¶ 36; Cook County SOF ¶ 44.)

### G.    August 2018 Five-Day Suspension for Remaining After Hours

On July 25, 2018, Rosenthal issued Plaintiff a pre-disciplinary notice for violating Personnel Rules when she "worked overtime without authorization on June 28, 2018." (Rosenthal SOF ¶ 37.)  Plaintiff testified that she stayed in the county building after her workday ended to prepare for the disciplinary hearing scheduled for the next day related to her failure to submit a current copy of her driver's license.  (Stinson Dep. 229:22–230:10.)  According to Plaintiff, Rosenthal harassed her by calling law enforcement officers, who then escorted her from the building.  (*Id.* 53:4–23).  Rosenthal testified that he was on the road when he received a call from an administrative assistant, informing him that Plaintiff had not left the office at 4:30 p.m. (Rosenthal Dep. 57:16–20.)  Rosenthal had not authorized Plaintiff to stay late or work overtime, so he called staff in the Sheriff's office and requested that "if indeed, someone was still in the office, if they would ask them to please leave, because they are not supposed to be there after hours." (*Id.* 58:1–6.)  Rosenthal understood that sheriff's staff did find Plaintiff in the office, and that when they asked her to leave, "she signed out and left."  (*Id.* 58:7-9.)  Plaintiff was subsequently issued a five-day suspension to be served in August.  (Cook County SOF ¶ 46.) Because these events occurred in the interim between Alexander's death and Wake's appointment, Rosenthal issued the discipline as Acting Administrator.  (Rosenthal SOF ¶ 38.)  He explained that doing so "would have probably been [his] decision in conjunction with discussions with Labor Relations and the Department of Administration, the bureau." (Rosenthal Dep. 61:4–7.)  Plaintiff's Union filed a grievance, and notably, Wake sustained the grievance, rescinding the

suspension and restoring the five days' pay.  (Cook County SOF ¶ 46.)  Plaintiff notes, however, that the suspension was not removed from her record as it has been cited in subsequent discipline.  (Pl.'s SOF ¶ 26.)

### H.  September 2018 Five-Day Suspension for Falsifying Time Records

In September 2018, Plaintiff was suspended for five days after she "double parked [her] vehicle in front of the Bridgeview Courthouse main entrance, entered the courthouse and officially swiped into work. [Plaintiff] then proceeded to leave the courthouse to park [her] car in the parking lot and then returned to the courthouse to start [her] work day."  (Cook County SOF ¶ 48.)  Plaintiff admits doing this but claims that she did so "because [she] was having an anxiety attack." (Stinson Dep. 127:18–129:19.)  Rosenthal testified that he had heard of other employees swiping into work before parking their vehicles, but that this was the first time he had contemporaneously been alerted to it.  (Rosenthal SOF ¶ 42.)  Wake approved the discipline and issued the suspension after finding that Plaintiff's actions violated several Personnel Rules.  (Cook County SOF ¶¶ 47, 49.)

### I.  October 2018 Change in Job Duties

Finally, Plaintiff claims that her job duties changed, starting in October 2018.  (Stinson Dep. 243:19–20.)  Specifically, Plaintiff claims that she was "taken off mail," told that she is "not to be answering phones," and, although Plaintiff has performed data entry since beginning employment with CCARC, Plaintiff says that she has now been "given responsibilities to only do data entry and given a quota that I have never encountered before and have been told that I can be written up if I do not make that quota."  (*Id.* 251:10–24; Cook County SOF ¶ 57.)  Rosenthal testified that all staff members have a quota of certificates that they are required to "enter," based on the number of days the employee has worked in the work week.  (Rosenthal Dep. 78:22–79:20.)

IV.    **Plaintiff's Charge of Discrimination to the EEOC and This Lawsuit**

Plaintiff filed a charge of discrimination with the EEOC on October 5, 2017.  (Ex. A to Am.

Compl. [28].)  The charge states:

> I began my employment with Respondent on or about February 25, 2013, and my current position is Clerk V. During my employment, I have been subjected to harassment and different terms and conditions of employment, including, but not limited to, being told how I can/cannot decorate my cubicle, being yelled at for assisting a customer, having my personnel information being shared with co-workers and being assaulted. I complained about the different terms and conditions of employment to Respondent. Subsequently, I was given a written warning and two day suspension.
>
> I believe I have been discriminated against because of my race, Black, sex, female, color, dark-skinned, and in retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(*Id.*)  Plaintiff checked boxes on the form indicating that she was discriminated against on the

basis of race, color, sex, and retaliation.  (*Id.*)  On December 19, 2017, the EEOC issued a

Dismissal and Notice of Rights, granting her the right to sue.  (Ex. B to Am. Compl.)

In this court, Plaintiff alleges that Defendants Cook County and Rosenthal retaliated

against her for complaining of race and sex discrimination in violation of Title VII and 21 U.S.C.

§§ 1981 and 1983.  Plaintiff's complaint specifically refers to her discussions with Alexander and

Martinez in August 2017 regarding cubicle decorations, and alleges that she had been retaliated

against through a written warning and suspensions soon after she reported the discrimination.

(Am. Compl. ¶¶ 11–12.)   Both Defendants seek summary judgment and advance similar

arguments in separate briefs.  Defendants contend that Plaintiff has not shown that she engaged

in activity protected by these statutes, and that, even if she had, her complaints of discrimination

were not the cause of the disciplinary actions taken against her.

## DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine

dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party "bears the burden of demonstrating the absence of genuine issues of material fact." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). If the moving party meets that burden, "the non-moving party must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). This requires the nonmovant to "go beyond the pleadings" to demonstrate that there is evidence "upon which a jury could properly proceed to find a verdict" in his favor. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Anderson*, 477 U.S. at 251). When ruling on a motion for summary judgment, the court will view the record in the light most favorable to the non-moving party and will draw all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255; *but see Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721–22 (7th Cir. 2018) (inferences "supported by only speculation or conjecture" will not suffice).

Title VII prohibits discrimination against employees on the basis of race, color, and sex, among other protected categories. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (citing 42 U.S.C. § 2000e-2(a)). Title VII also prohibits employers from retaliating against employees who have "filed a complaint or participated in an investigation of an unlawful employment practice." *Id.* (citing 42 U.S.C. § 2000e-3(a)). Section 1981 "prohibits race discrimination in the making and enforcing of contracts," *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011), but the "elements and methods of proof for § 1981 claims are 'essentially identical' to those under Title VII," so the court will consider them together.[6] *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 n.1 (7th Cir. 2012). As noted, Plaintiff's

---

[6] Plaintiff also alleged retaliation in violation of 42 U.S.C. § 1983. Plaintiffs may bring First Amendment retaliation claims under § 1983, but Plaintiff does not develop this argument by, for example, explaining how her complaints of discrimination were constitutionally protected speech. *See, e.g., Milliman v. Cty. of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018); *Wilhelm v. Calumet City*, 409 F. Supp. 2d 991, 998 (N.D. Ill. 2006).

complaint alleged discrimination on the bases of race, color, and sex, but the parties' briefs make clear that, in Plaintiff's words, "[t]his is a retaliation case brought under Title VII and Section 1981 and Section 1983."  (Pl.'s Resp. in Opp'n to Def. Mark Rosenthal's Motion [91], at 1.)  Following the parties' lead, the court addresses that claim alone.

"To survive summary judgment on a Title VII retaliation claim, an employee 'must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [defendant] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (citation omitted).  Courts "consider the evidence as a whole and conduct a 'straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [materially adverse action]?'" *Id.* (citation omitted).

## I. Statutorily Protected Activities

The court must first determine which of the complaints of discrimination that the parties discuss in their briefs constitute protected activity under Title VII.  The parties have addressed four of Plaintiff's complaints about discrimination:  First, in December 2015, Plaintiff allegedly complained of discrimination in a meeting with Martinez.  Second, in December 2016, Plaintiff sent a letter to Letitia Dominic of Cook County's EEO Office in which Stinson accused Rosenthal of being racist, sexist, and otherwise biased and subjecting her to harassment for more than one year.  (*See* Dominic Letter at PageID #:1239.)  Third, in January 2017, Plaintiff officially filed a notice with Cook County's EEO Office complaining of race discrimination based on the same conduct described in her letter to Dominic.  Fourth, in August 2017 Plaintiff complained to Alexander, Martinez, and Shostack about consistent retaliation and discrimination since January 2017.  The parties do not specifically discuss whether Plaintiff's charge of discrimination with the EEOC in October 2017 is protected activity, but the court understands that "formal EEOC charges [are] the most obvious form of statutorily protected activity."  *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012) (quotation omitted).

19

A complaint about discrimination may be protected activity even if a plaintiff is mistaken in believing that "the practice [s]he opposed was in fact a violation of [Title VII]." *O'Leary*, 657 F.3d at 631 (citations omitted). But "[s]tatutorily-protected activity requires more than simply a complaint about some situation at work, no matter how valid the complaint might be." *Skiba*, 884 F.3d at 718 (citation omitted). Rather, to be protected by Title VII, a plaintiff's opposition "must be based on a good-faith and reasonable belief that [s]he is opposing unlawful conduct," *O'Leary*, 657 F.3d at 631, and "the complaint must indicate that discrimination occurred because of sex, race, national origin, or some other protected class." *Skiba*, 884 F.3d at 718 (citation omitted). Defendants dispute that any of Stinson's complaints were statutorily protected activity. Defendant Cook County also argues that Plaintiff is improperly attempting to amend her complaint in her summary judgment response by identifying her December 2015, December 2016, and January 2017 complaints as protected activity. (Cook County MSJ Reply [97] at 6.) The court need not address that argument because it concludes that those three complaints were not protected activity.

Plaintiff first claims that in December 2015, she met with Martinez to report Rosenthal for discrimination and harassment. (Pl.'s Resp. to Rosenthal MSJ [91] at 2.) Complaining to supervisors or human resources employees of prohibited discrimination may constitute protected activity. *See, e.g., Coleman*, 667 F.3d at 859–60; *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). Defendants argue, however, that Plaintiff has failed to demonstrate with admissible evidence that she reported discrimination on the basis of her sex or race during this meeting. (Rosenthal MSJ Reply [100] at 3.) Plaintiff testified that in December 2015, she met with Martinez to report Rosenthal "for discrimination and harassment" "in every aspect of [her] job." (Stinson Dep. 133:6–24, 187:19.) Plaintiff could not, however, recall details of what she reported to Martinez (*id.* 187:21), and was "not sure which event . . . [she] reported." (*Id.* 134:2–3.) Plaintiff also testified that she sent an email to Martinez reporting the harassment, initially stating that she believed she wrote that the harassment was race-based, but then immediately

20

said "I'm not sure." (*Id.* 187:23–188:11.) Plaintiff has not produced this email. Because "vague" complaints do not constitute protected activity, and Plaintiff has offered no evidence that she in fact complained to Martinez of conduct that Plaintiff could have reasonably believed was unlawful, Plaintiff has failed to show that a reasonable jury could conclude that she engaged in protected activity by talking to Martinez in December 2015. *Northington v. H & M Intern.*, 712 F.3d 1062, 1065 (7th Cir. 2013); *see also Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.").

Plaintiff's second and third alleged complaints of discrimination and harassment are related. First, on December 8, 2016, Stinson wrote a letter to Letitia Dominic requesting Dominic's assistance with the "hostile and highly dysfunctional environment" in which Stinson claims to have been working. (Dominic Letter at PageID #:1239.) Second, on January 20, 2017 Plaintiff filed a formal complaint of harassment and discrimination with Cook County's EEO Office. (*See* Apr. 21, 2017 EEO Report at PageID #:1192.) In her December 2016 letter, Stinson wrote that she had been harassed by Rosenthal for more than a year and called Rosenthal "racist, sexist, [and] biased." (Dominic Letter at PageID #:1239.) Stinson's letter called Rosenthal racist and sexist, but did not assert that she was being harassed because of her race or sex. Plaintiff reported the December 2016 incidents when Rosenthal almost bumped into her and when he allegedly stepped on her foot. Plaintiff also noted that Rosenthal had told Peterson, Kelley, and Young not to speak to Plaintiff. Stinson wrote that she was "tired of being subjected to this type of harassment and abuse," and noted that the "problem is escalating, because now it has gotten physical." (*Id.*) As noted, Plaintiff's January 20, 2017 EEO complaint included the same allegations as her letter to Dominic, and in a report on its investigation of that complaint, the Bureau of Human Resources noted that Plaintiff believed Rosenthal mistreated her because of her race or sex and in retaliation for a union grievance she had filed. (Apr. 21, 2017 EEO Report

21

at PageID #:1193.)  The report observed that Stinson "did not provide specific facts about the conduct as it relates to her race or sex" (*id.*), and concluded that the evidence did "not sustain [Stinson's] allegations of workplace violence or harassment on the basis of sex or race."  (*Id.* at PageID #:1192, 1194–95.)

Complaints to an employer's EEO office may be protected activity, *see Coleman*, 667 F.3d at 859–60, but the court agrees with Defendants that a reasonable jury could not conclude that Plaintiff's December 2016 and January 2017 reports were protected activity.  Plaintiff did assert in these complaints that Rosenthal was racist and sexist, but Rosenthal's alleged behavior could not support a reasonable belief that Stinson was opposing unlawful conduct.  *See O'Leary*, 657 F.3d at 632–33.  Rosenthal's alleged sophomoric actions—bumping Plaintiff in the hallway and directing her coworkers not to talk to her—amount to "slights" and "snubbing" that are not actionable under Title VII.  *See Robertson*, 949 F.3d at 382 (quotation omitted) ("Snubbing by supervisors and co-workers is not actionable."); *see also id.* at 383 (quotation omitted) ("Title VII protects against discrimination, not personal animosity or juvenile behavior."); *Abrego*, 907 F.3d at 1014 (quotation omitted) ("'[P]etty slights' and 'minor annoyances' [are] not materially adverse employment actions.").  Nor has Plaintiff shown that Rosenthal's conduct could be considered "severe or pervasive" as required to find that the conduct was actionable race- or sex-based harassment.  *See Smith v. Illinois Dep't of Transp.*, 936 F.3d 554, 560 (7th Cir. 2019).  More importantly, Stinson did not connect Rosenthal's conduct to her race or sex.  Plaintiff did not report that Rosenthal used racially charged language.  Kelley and Peterson are also Black women, but by Plaintiff's account, Rosenthal did not treat them poorly.  Because there is no indication that Rosenthal's actions were discriminatory based on Plaintiff's sex or race, Plaintiff has failed to raise an issue for trial regarding whether her December 2016 and January 2017 reports of discrimination and harassment were protected activities.

Finally, in August 2017, Plaintiff complained to Alexander, Martinez, and Shostack about "consistent retaliation and discrimination" since January 2017.  (Pl.'s Resp. to Rosenthal MSJ at

8.)  In her brief, Plaintiff attempts to tie Rosenthal's allegedly discriminatory conduct in 2016 to this August 2017 complaint (*id.*), but her deposition testimony indicates only that she complained of discrimination since January 2017. (Stinson Dep. 86:11–15.)  The primary incident of discrimination that Stinson describes involved Alexander's reaction to how Plaintiff decorated her cubicle for Black History Month.  (Pl.'s SOF ¶ 24.)  On August 24, 2017, Stinson met with Alexander to discuss the cubicle incident and other retaliation and discrimination that had occurred since January 2017.  (Stinson Dep. 85:19–86:15.)  It is unclear whether this meeting occurred before or after the August 24 incident involving Mr. Shaffer.  Plaintiff testified that Alexander denied having discriminated against Stinson.  (*Id.* 87:1–5.)  Also on August 24, Plaintiff emailed and called Martinez to report that she had been discriminated against on the basis of her race.  (*Id.* 87:11–88:18.)  Finally, Plaintiff emailed Alexander, Martinez, and Shostack on August 25, 2017 to request a meeting to address "the constant harassment, bullying, and discriminatory practices" that she had encountered at the office.  (*Id.* 92:5–18; Email from Stinson to Alexander, Torres, & Martinez of Aug. 25, 2017 at PageID #:696, Ex. 18 to Stinson Dep.)  The only specific example Plaintiff provided was Alexander's comments to Plaintiff in front of Mr. Shaffer, but Plaintiff wrote that she had requested meetings in May 2017 and August 24, 2017 to discuss harassment, bullying, and discrimination.  (*Id.*)

Again, complaints of discrimination to supervisors may be protected activity, *Coleman*, 667 F.3d at 859–60, but Defendants argue that Stinson's verbal and written complaints to Alexander, Martinez, and Shostack do not qualify because they do not "specifically refer[ ] to discrimination based on her race or skin color, and there is otherwise no evidentiary or contextual basis to reasonably infer she was seeking to oppose unlawful discrimination on account of her skin color."  (Def. Rosenthal Mem. in Supp. Mot. Summ. J. ("Rosenthal MSJ") [80] at 6 (citing *Swinney v. Illinois State Police*, 332 F. App'x 316 (7th Cir. 2009); *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841 (7th Cir. 2008); *see also* Def. Cook County Mem. in Supp. Mot. Summ. J. ("Cook County MSJ") [75] at 8.)  Complaints of harassment or discrimination need not use

"magic words," but must make clear that the employee's protected characteristic is an issue, *Swinney*, 332 F. App'x at 318, by "includ[ing] a complaint of [race] discrimination or sufficient facts to raise that inference." *Andonissamy*, 547 F.3d at 851. In *Swinney*, the court concluded that "[a]n employee does not engage in protected activity merely by complaining of being 'picked on' unless that complaint makes clear that he or she is being mistreated because of sex or gender." 332 F. App'x at 318. In *Andonissamy*, the plaintiff claimed that he complained of national origin discrimination in an email to his supervisor. In affirming that the plaintiff did not engage in statutorily protected activity, the court noted that the message contained a "litany of complaints" about a colleague, about the plaintiff's work schedule, and high-pressure client work, "but nothing that a reader would interpret as a complaint of national origin discrimination." 547 F.3d at 851.

The court agrees with Defendants that the August 25 email to Alexander, Martinez, and Shostack cannot reasonably be understood to be a protected activity. Although Stinson complained of harassment and discrimination, the only specific instance she mentioned involved the incident with Alexander in front of a customer, Mr. Shaffer. Plaintiff suggests that Alexander, herself a Black woman, never similarly mistreated non-Black or lighter-skinned employees, but she offers no examples of how other employees were treated in similar situations. Overall, the incident is suggestive of unprofessional or rude behavior on Alexander's part, but not of race or sex discrimination. (*See* Email from Stinson to Alexander, Torres, & Martinez of Aug. 25, 2017 at PageID #:696.)

The court cannot conclude as a matter of law, however, that Plaintiff's verbal complaints do not amount to protected activity. Plaintiff responded affirmatively to a question asking whether she complained to Martinez of race discrimination. (Stinson Dep. 87:11–88:18.) Moreover, Defendants identify no other point in Plaintiff's deposition when she was asked to specifically explain which type of discrimination, if any, she mentioned to Alexander or Martinez. Nor are there any records of Plaintiff's in-person meeting with Alexander or her phone call to Martinez on August 24, so the record does not disclose with certainty what Plaintiff said during those

24

conversations.  It may be that Plaintiff included a variety of workplace issues unrelated to race discrimination in her communications with Alexander and Martinez such that they would not have realized that she was complaining of race discrimination.  *See, e.g., Swinney*, 332 F. App'x at 318 (citing *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007–08 (7th Cir. 2000)) ("complaints about matters other than pregnancy discrimination implied that pregnancy discrimination was not the issue.").  But drawing inferences in favor of Plaintiff, Plaintiff's complaint that Alexander was differentially enforcing a Cook County holiday decoration policy could indicate that Plaintiff was complaining of discrimination on the basis of her race—particularly because Plaintiff indicated that other non-Black employees had not been scolded about their decorations, and the decorations at issue were for a holiday celebrating the historical contributions of members of a protected class.  Accordingly, Plaintiff has raised a genuine issue for trial regarding whether her August 24, 2017 verbal complaints of discrimination to Alexander and Martinez were statutorily protected activities.

## II.     Materially Adverse Actions

Plaintiff argues that she experienced several materially adverse actions after complaining of discrimination:  (1) a written warning in September 2017; (2) a two-day suspension in September 2017; (3) a three-day suspension in October 2017; (4) another three-day suspension in December 2017; (5) a five-day suspension in June 2018; (6) a five-day suspension in August 2018 that eventually was reversed; (7) a five-day suspension in September 2018; and (8) a reduction in job duties since October 2018.[7]  In an earlier order [23], this court ruled that discrete acts of discrimination preceding December 9, 2016 are time-barred.  Accordingly, the court will not address Defendant Rosenthal's argument that Plaintiff's oral reprimand in January 2016 is not an adverse action.  (*See* Rosenthal MSJ at 6.)  Defendant Cook County separately argues

---

[7]     Stinson and Cook County also mention that a pay increase Plaintiff anticipated in March 2019 was delayed by a month, but Plaintiff does not argue that this independently constitutes a materially adverse action.  (Pl.'s Resp. to Cook County MSJ [92] at 3, 8–11, 18.)

that Plaintiff failed to exhaust administrative remedies for all allegedly adverse actions aside from the warning and suspension in September 2017 because those are the only instances of retaliation that Plaintiff included in her charge of discrimination with the EEOC. But because the court must assess each alleged adverse action for purposes of Plaintiff's § 1981 claim against Defendant Rosenthal, the court will first determine which of the claimed actions could be considered materially adverse.

The standard for actionable adverse actions for retaliation claims differs from the standard for discrimination claims. "In the retaliation context, the challenged adverse action need not be one that affects the terms and conditions of employment, but 'it must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (quotations omitted). Neither Defendant disputes that Plaintiff's suspensions, other than the reversed August 2018 suspension, amount to materially adverse actions.[8] And it is well established that "a suspension can constitute an adverse action." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009) (citing *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005)); *see also Abrego*, 907 F.3d at 1013 n.2.

Defendants argue that the written warning Plaintiff received in September 2017 is not a materially adverse action, and the court agrees. Federal law protects an individual only from "retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). By itself a warning, like a threat of unspecified disciplinary action, does not produce an injury. *See Poullard*, 829 F.3d at 856; *see also Whittaker*, 424 F.3d at 648 (quotation omitted) ("For example, if a written warning also led to ineligibility for job benefits like promotion, transfer

---

[8] Defendant Cook County appears to suggest that Plaintiff's September 2017 two-day suspension is not an adverse action, citing in a footnote *Bell v. City of Harvey*, No. 11 C 686, 2013 WL 3199976, at *5 (N.D. Ill. June 21, 2013). (Cook County MSJ at 10.) But Cook County does not develop this argument, and the Seventh Circuit has suggested that a three-day suspension without pay could constitute an adverse action, *see Whittaker*, 424 F.3d at 647, so the court finds that Plaintiff's September 2017 suspension may be a materially adverse action.

to a favorable location, or an advantageous increase in responsibilities, perhaps then we would find an action that is adverse."). Plaintiff argues that the September 2017 reprimand could deter a reasonable employee from reporting discrimination because Plaintiff claims that she was never trained on how to properly process mail prior to being reprimanded in September 2017. (Pl.'s Resp. to Cook County MSJ at 9.) But importantly, Plaintiff has not shown that she suffered accompanying "tangible job consequences" that could elevate the warning to the level of a materially adverse action. *See Robertson*, 949 F.3d at 383 (quoting *Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016)). Plaintiff notes that receiving a written reprimand permits Cook County to impose harsher discipline for future violations of the Personnel Rules, but cites no authority to support that a possibility of future discipline constitutes a tangible job consequence. *Cf. Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 665 (7th Cir. 2011) (noting that "[g]enerally, written warnings, standing alone, do not constitute materially adverse actions," but in that case, the warning was "coupled with" a memorandum limiting the plaintiff's ability "to be present at [her] workplace without first obtaining permission from [her] boss").

The court disagrees with Defendant Rosenthal's contention that Plaintiff's suspension in August 2018 that was later reversed does not amount to a materially adverse action as a matter of law. True, "a suspension without pay that is never served does not constitute an adverse employment action." *Nagle*, 554 F.3d at 1120. But Plaintiff served a five-day suspension without pay in August 2018 before Wake reversed it and ordered that she receive back pay. Five days without pay is not as onerous as the 37-day suspension in *Burlington Northern* that was eventually reversed, but as in that case, Plaintiff and her family had to live for several days without income. *See Burlington N.*, 548 U.S. at 72; *see also Nagle*, 554 F.3d at 1121 ("Although [plaintiff's] suspension was ultimately found to be improper, a reasonable jury still could find that having to serve the suspension would dissuade a reasonable employee from making or supporting a charge of discrimination."). Plaintiff also testified that she was not able to pay her bills on time as a result of the suspension. (Pl.'s SOF ¶ 26.) The court cannot conclude as a matter of law that even a

temporary loss of pay would not dissuade an employee from engaging in protected activity, because "[a]fter all, no one knew whether the suspension would be reversed or upheld, and reimbursement of lost pay is not sufficient to defeat [plaintiff's] Title VII retaliation claim." *Nagle*, 554 F.3d at 1121.

Defendant Cook County last argues that the diminution of Plaintiff's job responsibilities since October 2018 is not a materially adverse action. Plaintiff is no longer permitted to answer phones or open mail and spends her whole day typing reports. (Pl.'s Resp. to Cook County MSJ at 10.) As a result, Plaintiff now claims to suffer from carpal tunnel syndrome. (*Id.*) Defendant Cook County argues that the reduction in Plaintiff's job duties is not a materially adverse action. "[C]hallenged actions involving the reassignment of job responsibilities are typically not materially adverse unless there is a 'significant alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects.'" *Robertson*, 949 F.3d at 382 (quotation and emphasis omitted). In other words, "[w]hether a change in job responsibilities is materially adverse 'all depends on how much of a change, and how disadvantageous a change, took place.'" *Id.* (quotation omitted). Plaintiff has not disclosed how much time she spent on tasks other than typing reports prior to October 2018, so the court cannot meaningfully assess whether her duties have significantly changed since she complained of discrimination in August 2017. And while Plaintiff claims to suffer carpal tunnel from the alteration in her job duties, she has not indicated whether her hours, compensation, or career prospects have also changed. Accordingly, Plaintiff has failed to raise a genuine issue for trial regarding whether a reduction in her job duties since October 2018 constitutes a materially adverse action.

## III. Causation

Finally, to succeed on her Title VII and § 1981 claims, Plaintiff must point to evidence of a but-for causal connection between her protected activity and the materially adverse actions. "In the Title VII retaliation context, causation can be established by circumstantial evidence, which includes, for example, 'suspicious timing, a pretextual explanation for the termination, and

evidence that similarly situated employees were treated differently,'" but this list is not exclusive. *Abrego*, 907 F.3d at 1014 (quoting *Gracia v. SigmaTron Int'l Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016)). Rather, a plaintiff can also identify "other evidence from which an inference of discriminatory intent might be drawn." *Abrego*, 907 F.3d at 1015. The "dispositive question is whether a reasonable fact-finder could find a but-for causal link between the protected activities and adverse actions at issue." *Robertson*, 949 F.3d at 379 (quotation marks and alterations omitted). As a reminder, the remaining protected activity under review is Plaintiff's August 2017 reports of discrimination to Alexander and Martinez, as well as her October 2017 charge of discrimination with the EEOC. The remaining materially adverse actions are Plaintiff's six suspensions in September 2017, October 2017, December 2017, June 2018, August 2018, and September 2018.

Plaintiff advances the same causation arguments against both Defendant Cook County and Defendant Rosenthal. But Rosenthal denies knowing about Plaintiff's complaints of discrimination in August 2017 related to her cubicle decorations and states that he was unaware of Plaintiff's EEOC charge until March 2018 when this lawsuit was filed.[9] (Rosenthal Decl. ¶ 3, Ex. 6 to Rosenthal SOF [79-6]; Rosenthal MSJ Reply at 6.) Plaintiff disputes this, but points in response only to her complaint and her October 2017 EEOC charge in support. (Pl.'s Resp. to Cook County SOF ¶ 59.) Allegations in the complaint are not sufficient to create an issue of fact on summary judgment, and nothing about the language of the EEOC charge establishes that Rosenthal knew it existed, particularly given that Plaintiff did not specifically name Rosenthal in her charge. Plaintiff also testified that Rosenthal knew of the complaint she made to Martinez in 2015 "[b]ecause he told me he was going to contact her." (Stinson Dep. 201:18–4.) But Plaintiff never discussed the meeting with Rosenthal after that (*id.*), so Plaintiff's testimony does not

---

[9] As noted, Rosenthal acknowledges that he knew of Plaintiff's complaint to the Cook County EEO in January 2017, but as discussed, a reasonable jury could not find that Plaintiff's EEO complaint amounts to protected activity.

support that Rosenthal in fact talked to Martinez about the substance of the meeting.[10]  Because a "valid retaliation claim requires that the decisionmaker know of the protected activity," the only adverse actions that can be considered for purposes of Plaintiff's retaliation claim against Defendant Rosenthal are her suspensions in June 2018, August 2018, and September 2018. *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 633 (7th Cir. 2020).

Plaintiff argues that a reasonable jury could conclude that her complaints of discrimination were the but-for cause of her subsequent suspensions for several reasons.  Plaintiff suggests that there is evidence of a "culture of retaliation" at the CCARC; that Rosenthal humiliated Plaintiff by publicly serving her with discipline papers, which the court understands to be an argument that the reason given for her October 2017 suspension was pretextual; that Rosenthal asked the Sheriff to remove Plaintiff from her workplace after hours, which the court construes as an argument of differential treatment; and that other similarly-situated employees were not disciplined for engaging in similar altercations with other employees.  (Pl.'s Resp. to Cook County MSJ at 14–16.)

### A.    Timing

Both Defendants argue, first, that the suspensions in 2018 occurred too long after Plaintiff's complaints of discrimination to support a causal connection between the two.  Plaintiff's suspension in June 2018 was approximately ten months after she complained to Alexander and Martinez. Rosenthal himself became aware of Plaintiff's charge of discrimination some three months prior to the June 2018 discipline.  (Rosenthal MSJ at 7–8.)  "Suspicious timing can sometimes raise an inference of a causal connection, but temporal proximity alone is 'rarely sufficient' to establish causation."  *Castro*, 786 F.3d at 565 (quoting *O'Leary*, 657 F.3d at 635).

---

[10]    Plaintiff also cites to a 2016 grievance complaining of harassment and disparate treatment by Rosenthal referenced in an unauthenticated settlement agreement to support her contention that Rosenthal knew she had engaged in protected activity prior to August 2017.  (Pl.'s SOF ¶ 16; Pl.'s Resp. to Cook County MSJ at 17.)  The court cannot credit this assertion because, as discussed in more detail below, the Settlement Agreement is not admissible, and Plaintiff otherwise offers no evidence of this 2016 grievance.

Conversely, "the mere passage of time 'does not conclusively bar an inference of retaliation.'" *Castro*, 786 F.3d at 565 (quotation omitted). For example, if an employer begins taking punitive action against a plaintiff soon after her complaint of discrimination and continues for a while thereafter, a reasonable jury could still infer retaliatory intent. *See id.* at 568; *Coleman*, 667 F.3d at 861. But a substantial gap between protected activity and an adverse action does weaken a claim of retaliation. *See Robertson*, 949 F.3d at 381. Therefore, the fact that Plaintiff was suspended three months after Rosenthal learned of Plaintiff's complaint of discrimination and ten months after Plaintiff initially complained of discrimination does not by itself establish or defeat an inference of causation.

### B. Culture of Retaliation

An employer's "general policy and practice . . . can be relevant evidence of pretext or discrimination, . . . [y]et such evidence must undercut the specific justifications given by the employer" for the adverse actions. *Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 858 (7th Cir. 2019) (citations omitted) ("General allegations of an 'ongoing history of discrimination' are not enough to impugn a particular employment decision."). In support of her claim that CCARC had a culture of retaliation, Plaintiff cites to Hood's deposition in which he testified that "the culture of the department . . . was fear of retaliation from management" (Hood Dep. 45:23–46:2, Ex. C to Pl.'s SOF [86-3]), and Young's testimony that every time he complained about something, the treatment from Rosenthal and Alexander became worse for him. (Young Dep. 21:1–10; *see also* Stinson Dep. 205:18–19 ("[T]hat is the culture of Animal Control, to be disciplined out of retaliation.").) The court notes, however, that Hood was testifying about *Stinson's* beliefs: that is, he testified that Stinson "felt that the reason [the other union stewards] could not adequately represent her [in disciplinary hearings] is because of the culture in the department where there was fear of retaliation from management"; Hood himself had never complained of retaliation. (Hood Dep. 7:18–8:1, 45:23–46:2.) In any case, even assuming that the statements of three employees are sufficient to establish that CCARC had a culture of retaliation, Plaintiff has not

connected her argument that there was a general culture of retaliation to the specific reasons Rosenthal and Alexander gave for suspending Plaintiff—that she had violated the Cook County Personnel Rules on multiple occasions. Nor does a general culture of retaliation show that Rosenthal or Alexander, specifically, were motivated by a desire to retaliate against employees who complain of discrimination.

### C. October 2017 Differential Enforcement of Cook County Policy or the CBA

Plaintiff was suspended in October 2017 for refusing to accept disciplinary papers that Rosenthal attempted, within view of coworkers, to give her after a 2017 rabies clinic held in a public park. This suspension, Plaintiff urges, was in retaliation for her prior complaints of discrimination. (Pl.'s Resp. to Rosenthal MSJ at 11–12.) That is, she believes that the alleged violations of the Personnel Rules are pretextual. After Plaintiff refused to accept the disciplinary papers, Plaintiff was found to have violated several Personnel Rules including those covering disruptive behavior, destruction of Cook County property, failure to carry out the directive of a supervisor, failure to follow instructions, and leaving a place of work without permission during work hours. (Cook County SOF ¶ 35.) Plaintiff asserts that publicly delivering a pre-disciplinary notice to an employee deviated from past practices and violated the CBA. (Pl.'s Resp. to Rosenthal MSJ at 12.) She also claims that Rosenthal had previously been told not to give her discipline papers in public, although she acknowledges that Alexander had in fact directed Rosenthal to give Plaintiff the papers after the clinic at the time in question. (*Id.*) Rosenthal acknowledged that he had never previously given an employee discipline papers in a similar manner, but disputed Plaintiff's characterization of the incident as "public"; Rosenthal testified that the disciplinary papers were in a sealed envelope that was not identified as a disciplinary document. (Rosenthal Dep. 49:13–16.)

As the court understands her argument, Plaintiff contends that Rosenthal deviated from standard practice by the manner in which he delivered discipline papers to her, which shows an intent to retaliate or shows that her alleged violation of the Cook County Personnel Rules was

pretext for the true reason for her suspension. All of the relevant events, however, had occurred before March 2018, when Rosenthal learned that Plaintiff had engaged in protected activity. The court therefore considers this pretext argument only as against Defendant Cook County; Rosenthal testified that Alexander had directed him to issue the pre-disciplinary notice after the rabies clinic, and it is undisputed that Alexander knew of Plaintiff's August 2017 complaints of discrimination.

Selective enforcement of company policy or a deviation from standard procedures can establish that an employer's given reason for an adverse action is pretextual, but the evidence Plaintiff cites does not satisfy the court that Rosenthal's actions or Alexander's direction were in fact contrary to CCARC policy or the CBA. *Cf. Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 931 (7th Cir. 2020) (collecting cases). The fact that the Union considered it inappropriate to give an employee discipline papers publicly (Hood Dep.14:14–15), does not mean CCARC also held that view, or that doing so violated workplace policy. Plaintiff cites a Settlement Agreement negotiated by Dale Jackson, formerly of the Union, on her behalf that "requests that Mark Rosenthal issue all discipline in a private conference in accordance with Cook County Personnel Rules." (Shostack Decl. ¶ 7, Ex. D to Pl.'s SOF [86-4].) The Settlement Agreement, which appears to resolve a March 2016 grievance, is undated and not signed by anyone and, as Defendants note, is not admissible. (Cook County Resp. to Pl.'s SOF [98] ¶ 16; Rosenthal Resp. to Pl.'s SOF [99] ¶ 16.) Plaintiff's effort to authenticate the Settlement Agreement with a declaration from Shostack, her union representative, fails because Shostack was not involved in negotiating the agreement, and could identify the unsigned draft as an agreement negotiated by the union "on information and belief." (Shostack Decl. ¶ 6.) Shostack added, "I have no knowledge as to whether Cook County Animal Control signed this Settlement Agreement," and there is no evidence that the Agreement ever took effect. (*Id.*; *see also* Ex. B to Shostack Decl.) Plaintiff does not otherwise authenticate the document, nor does she identify which, if any, Cook County Personnel Rule requires that discipline be issued only in a private conference rather than in a sealed envelope.

Plaintiff also contends that Rosenthal's service of the pre-disciplinary hearing notification in public "arguably violated the Dignity and Respect Clause in the CBA." (Pl.'s SOF ¶ 18 (citing Shostack Decl. ¶ 11).) The Dignity and Respect Clause states:

> The County and the Union agree to promote a professional working atmosphere. Employees who believe they have been subjected to unprofessional or inappropriate treatment by a supervisor or co-worker may raise their concern regarding said treatment with the manager of Labor Relations who will investigate the complaint and advise the employee of any action taken which has been deemed necessary and appropriate under the circumstances.

(Ex. D1 to Pl.'s SOF at Art. XIII § 13.10.) But an arguable violation of the CBA is not the same as a violation of the CBA, and Plaintiff provides no evidence that anyone ever concluded that Rosenthal's conduct violated the CBA's Dignity and Respect Clause.

Delivering notice of a pre-disciplinary hearing to an employee in view of co-workers may have been unusual or unwise. Hood testified that, to his knowledge, it was a deviation from past practice for Rosenthal to issue discipline publicly, and Rosenthal himself testified that he had never previously given an employee discipline papers after a clinic in a public park. (Hood Dep. 14:3–5, 49:5–50:5.) But neither Hood nor Rosenthal testified that Cook County had a formal policy that prohibited the delivery of disciplinary papers to an employee—even papers not identified as such—within the view of other employees. Finally, Plaintiff notes that a number of employees signed the discipline notice that Rosenthal attempted to issue to Plaintiff. (Pl.'s SOF ¶ 20.) This demonstrates, in Plaintiff's view, that Rosenthal allowed those other employees to see the pre-discipline hearing notice. Rosenthal explained, however, that he wanted other employees to sign the notice as witnesses who could confirm that Rosenthal had attempted to deliver the papers to Stinson, and Rosenthal denied that the other employees would have had enough time to discern the substance of the document.[11] (Rosenthal Dep. 52:3–12.)

---

[11] Plaintiff also states that Rosenthal threw the envelope containing the disciplinary papers into her car, hitting her in the face and shoulder with the envelope in the process (Stinson Dep. 55:11–17), which Rosenthal denied (Rosenthal Dep. 50:2–4). On summary judgment, the court assumes that the envelope containing the disciplinary papers did hit Plaintiff in the face, but Plaintiff has not connected this fact to her claim of retaliation.

Drawing inferences in favor of Plaintiff, a reasonable jury could find that it was unusual for Alexander to ask Rosenthal to give Stinson disciplinary papers after a clinic—a situation in which other employees would be present. Defendants have not clearly explained why Alexander asked Rosenthal to do this, but any inference that this incident demonstrates a desire on Rosenthal or Alexander's part to retaliate against Plaintiff is speculative. An employer's differential enforcement of a policy may show that the given reason for disciplining an employee was pretextual. But Plaintiff has not established that Rosenthal's conduct in fact amounted to a violation or differential enforcement of workplace policy or of the CBA, nor has she presented a reason for her own refusal to accept the papers from Rosenthal after the clinic. For example, Plaintiff's assumption that she could leave work immediately after the clinic because that was typically permitted does not mean that she, in fact, was authorized to leave work early that day. Nor has Plaintiff otherwise shown that the reasons given for her discipline—generally, insubordination and leaving her workplace during work hours without permission—were lies. *See O'Leary*, 657 F.3d at 635. And while Alexander knew, before directing Rosenthal to deliver the papers to Plaintiff, that Plaintiff had complained of discrimination, that by itself is insufficient to infer that Alexander intended to retaliate by giving that direction. *See Kotaska*, 966 F.3d at 633 (citation omitted) ("A valid retaliation claim requires that the decisionmaker know of the protected activity, but that does not mean one can infer retaliation from the decisionmaker's knowledge alone."). Plaintiff offers no other evidence that Alexander or Rosenthal intended to retaliate against her, and Plaintiff's speculation in that regard is not enough to defeat a motion for summary judgment. *See Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016); *Brown*, 700 F.3d at 1108 ("[Plaintiff] must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have.").

Finally, any inference that the October 2017 suspension was pretext for retaliation is undermined by the fact that a Hearing Officer independently found that management had just cause for disciplining Stinson for refusing to accept paperwork after the clinic in September 2017.

(*See* Ex. 36 to Stinson Dep.)  Hearing Officer Colom took statements from six individuals, including Plaintiff and Rosenthal, and found that Plaintiff was not justified in refusing to meet with Rosenthal after the clinic because she had not yet been released from work. Colom also found that Rosenthal had first asked to speak with her privately.  (*Id.*)  Plaintiff disputes Colom's finding that there was just cause for the discipline (*see* Pl.'s Resp. to Cook County SOF ¶ 38), arguing that the disciplinary notice Rosenthal attempted to give her used the wrong form, that having coworkers sign a discipline form was a deviation from past practice, that Rosenthal's actions violated the CBA's Dignity and Respect Clause, and that Rosenthal did not need to deliver to Plaintiff the disciplinary notice in person. (Pl.'s SOF ¶¶ 17–18.)  These arguments do not expose material flaws in Colom's findings in a way that suggests the report is untruthful, nor has Plaintiff otherwise offered evidence that Colom would be inclined to wrongfully deny Plaintiff's grievance. *Cf. Vega v. Chicago Park Dist.*, 954 F.3d 996, 1005 (7th Cir. 2020).  Accordingly, Plaintiff has failed to raise a genuine issue for trial regarding whether her October 2017 suspension was retaliatory.

### D.      June 2018 Differential Treatment

As additional evidence of retaliation, Stinson points to Rosenthal's order to the Cook County Sheriff to remove Plaintiff from her workplace on a day in June 2018 when she had remained after hours.  (Pl.'s Resp. to Rosenthal MSJ at 12–13.)  Plaintiff testified that she had remained at work after her workday ended to prepare for a disciplinary hearing when the sheriff's staff came into the office, called her name, and told her that Rosenthal (who was not in the office at the time) had asked that Stinson be escorted from the building.  (Stinson Dep. 230:3–231:6.) Plaintiff was disciplined for working overtime without authorization, but after she filed a grievance, Wake overturned the August 2018 suspension. (*Id.* 231:4–6.)  Plaintiff's belief that Rosenthal had singled her out in retaliation is, again, based on speculation.  *See Formella*, 817 F.3d at 513; *Brown*, 700 F.3d at 1108.  There is no indication that Rosenthal differentially enforced a workplace policy or treated other employees more favorably.  Plaintiff asserts that other employees worked

late at the office and were not removed by the Sheriff (Pl.'s Resp. to Rosenthal MSJ at 12), but she cites no evidence to support that contention. Rosenthal testified that he had never before called sheriffs to remove an employee who was working late without permission (Rosenthal Dep. 57:12–13, 59:3–5), but he was not asked, and therefore did not address, whether another employee had ever stayed late without permission. Accordingly, Plaintiff has failed to raise a genuine issue for trial regarding whether her rescinded August 2018 suspension was retaliation for her report of discrimination.

### E. Similarly Situated Employees

Plaintiff last argues that other similarly situated employees were not disciplined for engaging in similar conduct, specifically with regard to Plaintiff's December 2017 suspension for allegedly "approach[ing] Ms. Samantha Williams in her cubicle in an aggressive manner using verbal and body language in an intimidating manner." (Cook County SOF ¶ 39; Pl.'s Resp. to Cook County MSJ at 18–19.) This incident occurred in December 2017, before Rosenthal knew that Plaintiff had engaged in protected activity, and therefore cannot be used to support Rosenthal's liability. But because Alexander directed Rosenthal to issue discipline for the altercation between Stinson and Williams (Rosenthal Dep. 53:1–7), the court will consider Plaintiff's proposed comparators for her claim against Cook County. Plaintiff claims that Tina Fortune and Christine Do were not disciplined after they were allegedly in an altercation, nor was Spring Kelley disciplined after she yelled in Richard Hood's face in front of Alexander and Rosenthal. (Pl.'s Resp. to Rosenthal MSJ at 13.)

"Similarly situated employees must be directly comparable to the plaintiff in all material respects." *Formella*, 817 F.3d at 512 (quotation omitted). The purpose of the comparison analysis is to "eliminate other possible explanatory variables" in order to "isolate the critical independent variable"—retaliatory animus. *Id.* (quotation omitted). In general, a plaintiff "must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as

would distinguish their conduct or the employer's treatment of them." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019) (citations and internal quotation marks omitted). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff has met his burden on this issue." *Id.* (internal quotation marks omitted).

Do, Fortune, and Kelley appear comparable to Plaintiff in several material respects. All held the same position as Plaintiff, and all directly reported to Rosenthal. (Pl.'s SOF ¶ 33.) Additionally, Rosenthal testified that there had never "been any complaints, grievances or lawsuits brought against [him] for harassment, discrimination or discipline [*sic*] treatment besides the complaints from the Plaintiff" (Rosenthal Dep. 67:5–9, 91:13–19), which, because it implies that Do, Fortune, and Kelley had never accused him of discrimination, helps isolate the issue of retaliatory animus. But, again, the incidents involving Do, Fortune, and Kelley cannot be used to support an inference of Rosenthal's retaliatory animus because Plaintiff was suspended for her alleged altercation with Williams in December 2017 (and for the alleged altercation with Do in September 2017), well before Rosenthal knew that Plaintiff had engaged in protected activity. Plaintiff has provided no evidence regarding whether Do, Fortune, or Kelley had ever complained that Alexander or another CCARC employee discriminated against them, which limits their relevance as comparators.

It is also not clear that Plaintiff's conduct was comparable to the altercations involving Fortune, Do, and Kelley. Plaintiff provides no details concerning the alleged altercation between Fortune and Do, so the court cannot meaningfully assess whether they engaged in similar conduct without being disciplined. Hood testified that Kelley yelled at him during a meeting in front of Rosenthal and Alexander. (Hood Dep. 37:16–7.) Luis Ortiz witnessed the incident and confirmed that Rosenthal and Alexander were present; Ortiz also stated that Kelley "lashed out at Rich Hood," without providing more detail. (Ortiz Dep. 31:10–23.) Hood also testified that he spoke with management about the incident, but there is no indication that he, or Fortune or Do, ever

filed formal complaints seeking disciplinary action, as Williams and Do did after their interactions with Stinson. (*See* Rosenthal SOF ¶¶ 25, 32.)

Finally, Cook County has a progressive discipline policy, meaning that each additional violation of its Personnel Rules leads to harsher discipline. (Pl.'s SOF ¶ 25.) Plaintiff has presented no evidence that Do, Fortune, or Kelley had a similar discipline history as Plaintiff, which, recall, included at least one other alleged altercation with a coworker before the incident with Williams. There is some indication that Fortune and Kelley had previously been issued pre-disciplinary notices. (Rosenthal Dep. 88:19–89:21.) Rosenthal testified that he gave Fortune a pre-disciplinary notice after Stinson complained that Fortune intimidated her in the office, though Alexander chose not to impose discipline. (*Id.* 70:6–23.) Kelley was reprimanded for permitting someone else to drive a work vehicle to a clinic even though she had been designated as the driver for that trip. (*Id.* 72:4–19.) But in a declaration, Wake wrote that Stinson had a longer disciplinary record than Do, Fortune, or Kelley. (Wake Decl. ¶¶ 7–8, Ex. C to Cook County SOF [76-4].) Given the County's progressive discipline policy, the lack of comparable discipline history for Plaintiff's proposed comparators means that Plaintiff has failed to show that other similarly situated employees who did not complain of discrimination were treated more favorably.

### F. Other Evidence of Retaliation

Plaintiff briefly advances other arguments that some of her suspensions are causally connected to her protected activity. With regard to her October 2017 discipline after Rosenthal attempted to give her discipline papers in public, Plaintiff argues that there is evidence of Rosenthal's racial animus against African Americans based on Rosenthal's treatment of Young. (Pl.'s Resp. to Rosenthal MSJ at 15–16.) But the material issue for Plaintiff's retaliation claim is whether Rosenthal harbored a motive to retaliate. Young did testify to his concern about retaliation (Young Dep. 20:20–22), asserting that "each time that you bring something up or talk to anyone about, whether it's Mark or Doc [Alexander], . . . nothing is ever done, and then eventually it turns around and gets a little worse." (*Id.* 21:1–5.) But there is no evidence that

Young had specifically complained of discrimination, and such vague allegations of mistreatment are not enough to show that Young had engaged in protected activity. In any case, as with Plaintiff's argument related to a culture of retaliation at CCARC, Plaintiff has not connected Young's experience to the specific reasons given to discipline her in October 2017.

With regard to Plaintiff's December 2017 and June 2018 suspensions, Plaintiff notes the Union's position that there was insufficient evidence to issue discipline, but does not develop this argument. (Pl.'s Resp. to Rosenthal MSJ at 16–17.) Finally, Plaintiff disputes her August 2018 suspension by arguing that it was common for employees to swipe in to work before parking their vehicles. (*Id.* at 17.) However common such a practice may have been, Plaintiff has not suggested it was appropriate, nor did she dispute Rosenthal's testimony that he had never been contemporaneously alerted to an employee doing this before Plaintiff. There is therefore no reason to suspect that Rosenthal differentially enforced the time -tracking policy. Nor does Plaintiff offer other evidence suggesting that the reasons given by Rosenthal and the County to discipline her—that she violated the Personnel Rules on several different occasions—were pretextual. In sum, Plaintiff has failed to raise a genuine issue for trial regarding whether her protected complaints of discrimination were the but-for cause of her suspensions between September 2017 and September 2018. Plaintiff, therefore, has failed to provide evidence to support each element of her Title VII and § 1981 retaliation claims and Defendant Cook County and Defendant Rosenthal are entitled to judgment as a matter of law.[12]

---

[12] Because the court finds that both Defendants are entitled to judgment on the merits of Plaintiff's claims, the court will not address Defendant Cook County's exhaustion argument.

## CONCLUSION

Plaintiff Stinson has failed to show that there is a genuine issue for trial on her Title VII and § 1981 retaliation claims.  Accordingly, Defendant Rosenthal and Defendant Cook County's motions for summary judgment [74, 78] are granted.


ENTER:


Date:  November 23, 2020

REBECCA R. PALLMEYER
United States District Judge